IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**DENNIS THOMPSON,**
        **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　　　　　**Case No. A-09-CA-493-SS**

**ZURICH AMERICAN INSURANCE COMPANY,
SPECIALTY RISK SERVICES, LLC, and
JANET WATSON,**
        **Defendants.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Zurich American Insurance Company, Specialty Risk Services, LLC, and Janet Watson (collectively "Defendants") Motion for Summary Judgment [#38], Plaintiff Dennis Thompson ("Thompson")'s Response [#44], Defendants' Reply [#49], Defendants' Objections to and Motion to Strike Thompson's Summary Judgment Evidence [#48], Thompson's Additional Summary Judgment Evidence [#60], Defendants' Motion for Sanctions and Motion to Strike Additional Evidence [#61], and Thompson's Response [#65]. Having reviewed the motions, responses, replies, applicable law, and the case file as a whole, the Court enters the following opinion and orders.

### Background

Thompson was injured on the job in Central Texas on November 3, 2007 while working as a welder. Pl. Resp. [#44] at 2. He was investigating a possible fire at a job site and stepped on a piece of wood causing him to slip and twist his right ankle and flex his right knee behind him. *Id.*

He received treatment from Nicholas Baxter, M.D., on November 5, 2007. Def. App. at 1. Baxter ordered x-rays of the right knee and right ankle which revealed no damage and suggested an MRI if Thompson's pain persisted. *Id.* at 2-3. Baxter diagnosed a sprained ankle and strained knee with slight swelling of the ankle and gave Thompson a knee brace and an ankle brace and released him to return to work without restriction as of November 5, 2007. *Id.* at 1. Thompson returned to work and he was put on light duty. Pl. Resp. at 2. Although the parties disagree about the reason for his decision, it is undisputed that two weeks after returning to work, Thompson resigned his position and returned home to Pelham, Georgia. *Id.*

Thompson sought follow-up care in Georgia with David Drury, M.D., his long time physician. *Id.* Nearly three months after the injury, on February 28, 2008, an MRI was performed which revealed a torn meniscus.[1] Pl. Resp., Ex. L. There is some dispute about what happened next. Thompson claims Drury referred him to an orthopedic knee surgeon, John Waldrop, M.D., at the Hughston Clinic. *Id.* at 2. Thompson claims Defendants refused the request for referral to Waldrop. *Id.* at 2-3. Defendants assert no request for referral or preauthorization for orthopedic surgery was ever received. *See* Def. Mot. at 9. There is no dispute about what followed. The carrier hired an independent third party service which selected Alan Strizak, M.D., an orthopedic specialist, to perform a records and peer review. Def. Mot. at 3. On March 13, 2008, Strizak opined that the accepted injury of right ankle and right knee pain was not consistent with the MRI results and the meniscus tear was not work related, but instead was more probable than not an injury which pre-

---

[1] Specifically, the radiology report revealed a horizontal cleavage tear of the medial meniscus with extension to the superior articular surface without free fragment, and a Baker's cyst extending posteriorly with a small suprapatellar effusion with apparent synovial thickening/plicae involving the medial patellofemoral joint space. Def. App. at 10-13.

dated the incident of November 3, 2007. Def. App. at 14-18. Based on the peer review, on March 14, 2008 Janet Watson, the adjuster assigned to this claim, disputed the claim that the torn meniscus was related to the compensable injury. Def. Mot. at 3. She also generally disputed disability. *Id.*

Eventually, Thompson instituted proceedings with the Division of Workers' Compensation for administrative resolution of both whether the meniscus tear was related to the compensable injury and the question of disability. *Id.* Thompson was sent to a doctor designated by the Texas Department of Insurance, Derry Crosby, M.D. Pl. Resp. at 3. Crosby opined the meniscus tear was a result of the work related injury. Pl. Ex. K. The Division of Workers' Compensation ruled the compensable injury did extend to the meniscus tear and Thompson had the inability to work as a result of the compensable injury. Pl. Ex. B at 2-3. In accordance with this ruling, disability benefits were paid and Thompson began orthopedic treatment. Pl. Resp. at 4. On February 20, 2009 Thompson had surgery on his right knee. *Id.*

Subsequently, Thompson brought this suit against Zurich, the insurance carrier, SRS, the third-party adjusting firm, and Janet Watson, the adjuster employed by SRS. Thompson alleges common law claims for breach of the duty of good faith and fair dealing for failure to conduct a reasonable investigation, alleging Zurich had no reasonable basis for denying or delaying benefits. He further alleges Defendants failed to attempt to effectuate a prompt, fair, and equitable settlement of a claim with respect to which liability has become reasonably clear, in violation of TEX. INS. CODE § 541.060(a)(2)(A); failed to provide a reasonable explanation for the reason of the denial, in violation of TEX. INS. CODE § 541.060(a)(3); failed to conduct a reasonable investigation in violation of TEX. INS. CODE § 541.060(a)(7); made misrepresentations of fact about the insurance policy in violation of TEX. INS. CODE § 541.061(1); failed to disclose facts about the insurance policy in

violation of TEX. INS. CODE § 541.061(2)-(3); and allowed an employer to dictate the handling of the claim in violation of TEX. INS. CODE § 415.022. Thompson also claims he is a consumer under the Texas Deceptive Trade Practices Act ("DTPA") and asserts the Insurance Code violations also violate the DTPA. Finally, Thompson alleges the delay in providing income and medical benefits resulted in a loss of credit reputation and a delay in surgery which caused a worsening of his condition. He also claims he is entitled to punitive damages for Defendants' bad faith denial of his benefits. For their part, Defendants filed for summary judgment on all claims and also request sanctions for the filing of a sham affidavit in connection with a deposition.

**Analysis**

**I.  Summary Judgment Standard**

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## II.  Discussion

Under Texas law, there is a duty on the part of an insurer to deal fairly and in good faith with an insured in processing and paying claims.[2] This duty arises from the inherent power imbalance between the insurer and the insured. *See Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). Insurers have the right to deny questionable claims without being subject to liability for an erroneous denial. *See, e.g., St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 526 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (citing *Aranda v. Ins. Co. of N. Amer.*, 748 S.W.2d 210, 213 (Tex. 1988)). A bona fide controversy is sufficient reason for an insurer's failure to make a prompt payment of a loss claim. *Id.* So long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined to be erroneous, the insurer is not liable for the tort of bad faith. *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993). Thus, evidence that shows only a bona fide coverage dispute does

---

[2]Defendants assert a claim for breach of duty of good faith and fair dealing and violations of the Texas Insurance Code may no longer be viable in the workers' compensation context. Def. Mot. at 5. Defendants assert this issue is currently before the Texas Supreme Court in *Texas Mutual Insurance Company v. Ruttiger*. *See* 265 S.W.3d 651 (Tex. App.—Houston [1st Dist.] 2008, pet. granted). As these claims are currently viable, and the result of this order would be the same even if the Texas Supreme Court were to eliminate such claims, the Court will proceed under the law as it currently stands.

not rise to the level of bad faith. *See Robinson v. State Farm Fire & Cas. Co.*, 13 F.3d 160, 162 (5th Cir. 1994).

Relatedly, an insurer cannot escape liability by failing to investigate a claim in order to assert liability was never reasonably clear. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 n.5 (Tex. 1997) (reaffirming "an insurance company may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim"). Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the fact finder. *Id.* at 56. Even so, if there is no genuine issue of material fact judgment can be rendered as a matter of law. *Id.*

Thompson alleges Defendants acted in bad faith by denying his claim, failing to effect a prompt, fair, and equitable settlement of the claim, failing to provide a reasonable explanation for denial, failing to conduct a reasonable investigation, and failing to disclose facts about the insurance policy or misrepresenting facts about the policy. The most significant issue in all of Thompson's claims is whether Defendants had a reasonable basis on which to dispute or deny coverage.

### A.     Reasonable Basis to Deny a Claim

It is undisputed that Thompson received an MRI revealing a torn meniscus and in response to the MRI results, Defendants sought a review of records and peer review from Strizak. It is also undisputed that as a result of Strizak's review and opinion, Defendants subsequently sent Thompson a "Notice of Disputed Issue(s) and Refusal to Pay Benefits." Def. App. at 19. Defendants disputed that the "tear of the medial meniscus, strain to the MCL, Baker's cyst, suprapatellar effusion, and thickening/plicae involving the medial patellofemoral joint space" identified in the MRI were related to the compensable injury. *Id.* Defendants, based on Strizak's opinion, believed the

meniscus injuries were pre-existing and not related to the original injury. *Id.* Defendants also generally disputed disability. *Id.* As a result of this dispute, Thompson did not see the orthopedic knee surgeon, Waldrop, until approximately eight months later—after the Division of Workers' Compensation ruled the compensable injury did extend to the meniscus tear and Thompson had the inability to work as a result of the compensable injury. Pl. Ex. B at 2-3. In short, viewing all facts in a light most favorable to Thompson, Defendants did deny or delay payment for treatment surrounding the meniscus tear.³ The law only requires insurers not deny or delay payment once liability becomes reasonably clear. *See Giles*, 950 S.W.2d at 56. Thus, the questions are whether the denial or delay occurred after Defendant's liability became reasonably clear, and whether Defendants had a reasonable basis at the time they denied or delayed payment.

"Whether there is a reasonable basis for denial of a claim must be judged by the facts before the insurer at the time the claim was denied." *Stoker*, 903 S.W.2d at 340 (citing *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex.1990)). It is an "objective determination" involving whether "a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits." *Id.* (internal quotation marks omitted). So long as a reasonable basis for denial of the claim exists the insurer will not be subject to liability for an erroneous denial of a claim. *Id.*

---

³Indeed, although this is essentially undisputed, the parties argue pointlessly about this issue. Defendants assert they did not deny or delay medical care because there is no evidence there was ever an official preauthorization request for referral. Thompson argues Drury's testimony and office notes indicate Defendants denied Drury's referral to an orthopedic surgeon. This dispute is irrelevant for the Court's decision on summary judgment. Defendants undisputedly asserted no liability for treatment related to the meniscus tear based on the surrounding facts and Strizak's report. *See* Pl. Ex. Q. Whether there was a preauthorization request, or Defendants denied a referral, the undisputed facts indicate Defendants failed to pay Thompson for care related to the meniscus tear until after the Division of Worker's Compensation found Thompson's meniscus tear was covered. Pl. Resp. at 33; Def. Mot. at 3. The only question is whether this was a reasonable decision or made in bad faith. This issue is also the foundation for the motion for sanctions, and thus that motion is denied.

Defendants posit they had a reasonable basis for disputing the compensability of the meniscus tear and thereby delaying payment of Thompson's medical care related to that injury. First, Thompson was initially diagnosed with an ankle sprain and knee strain and released to full work duty. *See* Pl. Ex. H. Nearly three months later, Drury took an MRI and diagnosed Thompson with a meniscus tear. Pl. Ex. L. Based on the striking difference between the compensable injury, an ankle sprain and knee strain with mild swelling of the ankle and little trace of bruising on the ankle, and the results of an MRI three months later indicating a torn meniscus, and without any knowledge of the reasons for the delay in follow-up care or what Thompson was doing during those three months, Defendants sought a peer review of the medical records from Strizak. *See* Def. App. at 14.

Strizak opined that the MRI results did not correlate with the reported injury. He indicated instead that the "relatively large tear of the medial meniscus . . . described as horizontal cleavage tear" suggested a complex degenerative process. *Id.* at 15. In addition, he found the presence of a Baker's cyst, which is associated with longstanding meniscus tears, "establishes the meniscus tear as predating the incident under consideration." *Id.* Thus, he concluded "the findings on MRI of the right knee from February 28, 2008, represent the natural progression of pre-existent conditions and/or subsequent injuries not causally related to, aggravated by, or accelerated by injuries specifically sustained in the [compensable injury]." *Id.* at 17. On the basis of Strizak's opinion, the delay in treatment, and the comparably minor original diagnosis of a sprained ankle and strained knee, Defendants disputed the cause of the meniscus tear as not related to the original compensable injury, but rather indicative of a condition pre-dating the compensable injury. *Id.* at 19.

A physician's opinion on medical causation is a reasonable basis on which an insurer can dispute a workers' compensation claim. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v.*

*Dominguez*, 873 S.W.2d 373, 377 (Tex. 1994). However, an insurance carrier's reliance on an expert is not an absolute shield from liability: (1) "if there is evidence that the report was not objectively prepared;" or (2) "the insurer's reliance on the report was unreasonable." *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997) (citing *Lyons v. Millers Casualty Ins. Co.*, 866 S.W.2d 597, 601 (Tex.1993); *Dominguez*, 873 S.W.2d at 377. If nothing is presented suggesting that the evidence upon which the insurer relied was obtained in an unobjective or unfair manner and if that evidence, viewed in isolation, reasonably suggests that the insured's claim is invalid or questionable, the insurer's basis is reasonable as a matter of law. *Lyons*, 866 S.W.2d at 601.

Dr. Strizak is a board certified orthopedic surgeon. *Id*. He is also certified as a fellow of the American Board of Quality Assurance and Utilization Review Physicians and a certified evaluator of disability and impairment rating with the American Academy of Disability Evaluating Physicians. *Id.* at 30. He has maintained a clinical practice in California since 1984, primarily treating and surgically repairing knee injuries. *Id.* at 32. He maintains a Texas license in order to work with a group on a project regarding the management of patients with chronic pain, and to do work for insurance carriers. *Id.* at 33; Pl. Resp. at 22.

In order to show some evidence indicating a report was not objective or reliance was unreasonable, a plaintiff must do more than provide conflicting experts. *See Guajardo v. Liberty Mut. Ins. Co.*, 831 S.W.2d 358, 365 (Tex. App.—Corpus Christi 1992, writ denied) ("In addition to the conflicting expert opinion, the party alleging bad faith must also bring direct or circumstantial evidence showing that the carrier's expert's opinion was questionable *and* that the carrier knew or should have known that the opinion was questionable."). In other words, a dispute between experts about causation is insufficient to show the insurer had no reasonable basis for denying or delaying

payment of the claim, and it knew or should have known that fact. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994) (citing *Arnold*, 725 S.W.2d at 167; *Aranda*, 748 S.W. 2d at 213).

Thompson purports to offer evidence indicating Strizak's report was not objective and that Defendants' reliance on the report was unreasonable. Specifically Thompson points to (1) the expert testimony and medical opinions of Waldrop, Drury, and Crosby; (2) Defendant Watson's failure to investigate by contacting Drury; (3) Strizak's compensation by Defendants; (4) Strizak's work for insurance companies in Texas; and (5) Strizak's failure to examine Thompson or review the MRI films.

Thompson compares his evidence to the evidence found to establish a fact issue for the jury in two cases: *Nicolau*, 951 S.W.2d 444; and *Guajardo*, 831 S.W.2d 358. However, Thompson's evidence does not rise to the same level as the evidence in these cases. At best, he presents a scintilla of evidence upon which a rational jury could not find for Thompson. *See Sadler*, 909 F.2d at 837.

In *Nicolau*, an insurer hired an engineering company to provide a report on foundation damage to the Nicolau's home and opine on whether it was caused by a covered plumbing leak. *Nicolau*, 951 S.W.2d at 447. Evidence was presented showing eighty to ninety percent of the engineering company's work was done for insurance companies. *Id.* at 448. In addition, there was evidence the engineering company hewed to the general view that plumbing leaks are unlikely to cause foundation damage. *Id.* The engineering company was so adamant about this issue that the only two engineers to ever opine a plumbing leak did cause foundation damage never worked on a slab foundation case again. *Id.* at 449. In addition, there was testimony that the insurer was aware of the company's view and chose to hire the company because of its opinion regarding the lack of

a causal connection between plumbing leaks and foundation damage. *Id.* at 448-49. Finally, there was also evidence the insurer knew the expert's report did not justify denying claims. *Id.* at 449.

In *Guajardo*, the court reversed a grant of summary judgment in the district court because "the weight of contrary expert opinion necessary to destroy the carrier's reasonable basis is a question of fact for the jury." *Guajardo*, 831 S.W.2d at 365. However, the circumstances of the case were significantly different than here. Guajardo was a truck driver who was in a serious roll-over accident. *Id.* at 360. At the time of denial of benefits, the insurer had four doctors' reports, three of which indicated Guajardo still had problems related to the accident, but his prognosis was good and he was improving. *Id.* The insurer's doctor indicated, however, Guajardo's symptoms were "substantially overstated" and he could return to work immediately. *Id.* The day the insurer received this last report it stopped his workers' compensation benefits. *Id.* Just eight days after stopping the benefits, Guajardo had an MRI revealing degenerative disc disease. *Id.* at 361. The doctor indicated Guajardo could return to work, but he would have permanent limitations on lifting, bending, and stooping. *Id.* Thus, he would not be able to return to his profession as a truck driver. *Id.* There was significant evidence indicating the insurer had received *continuous correspondence* from health-care providers regarding Guajardo's condition from the time of the accident. *Id.* at 363 (emphasis in original). Yet, the first time one doctor found he should return to work, in the face of three others who indicated he was not yet ready to return to work, the insurer stopped paying benefits immediately.

Thompson wishes the court's holding to stand for the proposition that anytime there are contrary expert opinions, there is a fact issue concerning whether the insurer had a reasonable basis to deny coverage. However, the court instead stated an insurer "should generally be able to rely on

its own expert's opinion as a reasonable basis for denial . . . [although] situations may arise in which contrary medical opinion casts sufficient doubt on the reliability of the carrier's expert's opinion, that the carrier no longer has a reasonable basis to deny coverage." *Id.* at 365. The court went on to clarify the quantity of contrary expert opinion necessary to cast doubt was a fact question, but this did not mean all cases with contrary expert opinions should go to the jury. Rather:

> A conflict between the carrier's expert and other experts may or may not, standing alone, be sufficient to allow a bad faith suit to go to a jury. In addition to the conflicting expert opinion, the party alleging bad faith must also bring direct or circumstantial evidence showing that the carrier's expert's opinion was questionable and that the carrier knew or should have known that the opinion was questionable.

*Id.* Thompson fails to provide such evidence.

These cases have significant evidence of opinions which are not objective and evidence the insurer knew the opinions were not reliable. There is no such evidence in this case. Thompson certainly characterizes the evidence as suggestive that the report was not objective, but the evidence itself does not support Thompson's characterization. Like in *Guajardo*, Thompson relies on three contrary expert opinions. However, the question is whether with the information in front of Defendants at the time of the claim dispute would lead a reasonable insurer to deny the claim. *Stoker*, 903 S.W.2d at 340. ("Whether there is a reasonable basis for denial of a claim must be judged by the facts before the insurer at the time the claim was denied."). The only expert besides Strizak whose opinion was in front of Defendants was Drury's report. However, Drury is a general practitioner, and as Drury himself testified, he defers to Strizak's opinions on matters of orthopedics because Strizak had a higher level of expertise. *See* Def. App. at 39. Waldrop and Crosby both examined Thompson more than four months after the dispute of causation first arose. *See* Def. Reply at 3.

*Guajardo* was also distinct from Thompson's case since there was no dispute about causation, merely a dispute about Guajardo's medical condition.  The court found the insurer had been regularly updated by health care providers regarding Guajardo's condition and thus the insurer's sudden cancellation of benefits was unreasonable.  In Thompson's case, Defendants knew he had sprained his ankle and strained his knee on the job.  Defendants heard nothing from Thompson regarding his medical condition for three months until being notified that he had a torn meniscus and would need the care of an orthopedic surgeon.  It is imminently reasonable for Defendants to investigate the case and eventually deny benefits based on their expert, which is what they did.  They certainly did not dispute the torn meniscus, but only the issue of whether it was caused by the compensable injury which occurred three months earlier.  Again, Defendants have the right to deny or dispute questionable claims without being subject to bad faith liability for an erroneous denial.  *See Aranda*, 748 S.W.2d at 213; *Lyons*, 866 S.W.2d at 600.

As for Watson's failure to investigate, Thompson relies solely on her failure to call Drury.  *See* Pl. Resp. at 15-17.  While Watson testifies she did not call Drury and Drury testifies Watson did not call him, this hardly indicates a failure to investigate.  *Id.* (citing Pl. Ex. D).  Watson had the medical records furnished by Drury.  She spoke with her contact in Drury's office, and while she admits she could have spoken to the doctor, she believed the medical records were more important because they gave all the information in hard copy.  *Id.*  In addition, as Drury admitted, he is not an orthopedic expert.  Further, Thompson does not point to any evidence not already in Drury's report which Watson could have obtained had she spoken to Drury.  Certainly, "an insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial."  *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex.1998).

Similarly, an insurer cannot escape liability by "failing to investigate a claim so that it can contend that liability was never reasonably clear." *Giles*, 950 S.W.2d at 56 n. 5. However, Texas courts have clarified the insurer does not have a "duty to leave no stone unturned" in its investigation. *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 288 (Tex. App.—San Antonio 1992, writ denied). Cases finding insurers pursued investigations in bad faith often center on coverage denials following little or no investigation, which is not the case here. *See e.g. Tex. Mut. Ins. Co. v. Morris*, 287 S.W.3d 401, 411 (Tex. App.—Houston [14th Dist.] 2009, pet. filed) (evidence demonstrated no more than a "cursory inquiry").

Thompson also argues Strizak was paid and works for numerous insurance companies. This alone is not sufficient. If it were, bad faith claims would go to a jury virtually every time. As such, Texas courts have expressly rejected this proposition. *See e.g.*, *Travellers v. McClelland*, 189 S.W.3d 846, 854 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("[I]n order to show bad faith, the evidence must show behavior more egregious than merely hiring a firm whose reports generally feature an outcome favored by its recipient.") (citing *Nicolau*, 951 S.W.2d at 449). Thompson argues bias in selecting Strizak is clear by Watson's inability to name another doctor who does peer review. Her relevant testimony reads in full:

```
                            150
2    Q.    And I'll give you a chance—a chance to think
3          about it. Doing your work as a workers' compensation
4          adjuster for Zurich, for SRS, is there any doctor you've
5          seen giving peer review reports more than Dr. Strizak?
6    A.    There again, I don't know. I can't answer
7          that.
8    Q.    Can you think of the name of a single doctor
9          that you say, yep, I know I've seen his name giving peer
10         review reports more than Dr. Strizak?
11   A.    There again, I can't say. I don't know.
```

```
12    Q.    Can't think of one name?
13    A.    Not right offhand I can't. I use the – there
14    is always a variety of doctors that the vendors –
15    excuse me – the vendor used.
```

Pl. Ex. D. Thompson characterizes this testimony as indicating Defendants do not use any other doctors and choose Strizak because he gives the opinions which favor insurers. However, this is an enormous overstatement of Watson's testimony. Her testimony, at best, indicates Strizak may have done many peer review reports. However, she also indicates a variety of doctors submit reports. Nothing in her testimony indicates Defendants deliberately choose Strizak for any reason. Further, there is no evidence in her statement, or any other part of the record, indicating bias on the part of the third party which selected Strizak to perform the peer review.

      Finally, Thompson relies on Strizak's failure to review the MRI films themselves. Strizak admittedly only reviewed the MRI report. However, as Defendants explain, of the three doctors on whose opinions Thompson relies, Crosby also did not have the films, Waldrop is not sure if he saw the films, and Drury may or may not have viewed the film, but clearly indicates he relied on the report. Pl. Ex. F at 13:16-14:18. Thus, Strizak's failure to view the films is not unreasonable. None of the contrary experts indicate relying on the films and at least one of them also never viewed the films. As Strizak testified, the radiologist is the expert on reviewing the MRI films and the radiologist's report is often the most reliable interpretation of the MRI films. In addition, Strizak testified he would have preferred to review the films, and if he were performing surgery he would review them, but where he is only offering an opinion on another doctor's diagnosis, the report would suffice. Pl. Resp. at 24 (citing Pl. Ex. G).

Thus, focusing on the specific elements that must be proved, the Court finds no evidence that Defendants had no reasonable basis to deny payment of Thompson's claim. In short, Thompson's evidence has shown, at most, a bona fide coverage dispute. This is insufficient to demonstrate bad faith in denying or delaying payment of a claim. *Nicolau*, 951 S.W.2d at 448. No rational jury could find for Thompson based upon the record evidence before the Court. *See Sadler*, 909 F.2d at 837. Thus, Defendants are entitled to summary judgment on Thompson's bad faith claim. The Court now turns first to Defendants arguments for judgment based on damages and standing, and then to Thompson's other causes of action.

**B.     Damages**

Defendants argue for summary judgment of all claims because Thompson does not present evidence of independent injury. As Thompson points out, this argument is virtually incomprehensible. Thompson is not seeking to recover unpaid workers' compensation benefits, which would not represent an independent injury. Rather, he is seeking damages he alleges he has suffered as a result of Defendants' conduct. Namely, he seeks pain and suffering damages, worsening of his injury due to the delay in medical treatment, additional financial injury such as higher interest rates due to his lack of compensation, and emotional pain and stress. Pl. Resp. at 37. Thompson has presented significant evidence of independent injury damages spanning approximately twelve pages of his response. Pl. Resp. at 38-50. Thus, Defendants are not entitled to summary judgment on this basis.

**C.     Standing**

Defendants also argue Thompson lacks standing to pursue his statutory causes of action because Thompson is a non-party to the workers' compensation insurance contract. This argument

is invalid under *Aranda* which clearly held: "The Workers' Compensation Act sets forth a compensation scheme that is based on a three-party agreement entered into by the employer, the employee, and the compensation carrier . . . The employee is thus a party to the contract and therefore entitled to recover in that capacity." *Aranda*, 748 S.W.2d at 210. Thus, Defendants are not entitled to summary judgment based on their standing argument.

### D. Statutory Causes of Action

Defendants are, however, entitled to summary judgment on the remainder of Thompson's statutory claims because those claims rely directly on Thompson's allegations of wrongful denial of coverage. When an insured joins claims under the Texas Insurance Code and the DTPA with a bad faith claim, all asserting a wrongful denial of policy benefits, if there is no merit to the bad faith claim, there can be no liability on any of the statutory claims. *See Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) (indicating tort claims under the Texas Insurance Code and DTPA require the same predicate for recovery as bad faith causes of action). In short, because Defendants are entitled to summary judgment on the bad faith claim, summary judgment on all the statutory claims follows.

#### 1. Insurance Code

Thompson's claim for failure to attempt to effectuate a prompt, fair, and equitable settlement of a claim with respect to which liability has become reasonably clear, in violation of TEX. INS. CODE § 541.060(a)(2)(A) fails because, as discussed above, Defendants had a reasonable basis on which to dispute or deny coverage and when liability became clear following the Division of Workers' Compensation hearing, Defendants paid all benefits required. *See* Pl. Resp. at 33; Def. Mot. at 3.

Thompson's claim for failure to provide a reasonable explanation for the reason of the denial,

in violation of TEX. INS. CODE § 541.060(a)(3) also fails for a similar reason. The parties agree Defendants sent Thompson a notice of dispute. Thompson argues, however, that the notice did not provide a reasonable explanation because Defendants were acting unreasonably in disputing causation. Pl. Resp. at 19 n.4 ("[N]o reasonable explanation was given because there could be no reasonable explanation for denial—one does not exist.") As the Court explained above, Defendants were reasonable in disputing coverage, and the explanation given to Thompson for the denial was therefore also reasonable.

Thompson's claim for failure to conduct a reasonable investigation in violation of TEX. INS. CODE § 541.060(a)(7) is denied for the same reason. As the Court held, Defendants did not breach their duty of good faith and fair dealing, in part, because Defendants conducted a reasonable investigation which led to a reasonable decision to dispute coverage.

Thompson's claim for misrepresentations of fact about the insurance policy in violation of TEX. INS. CODE § 541.061(1) and failure to disclose facts about the insurance policy in violation of TEX. INS. CODE § 541.061(2)-(3) are denied for the same reason. The misrepresentation and failure to disclose Thompson alleges relate to the "scope of coverage" under the policy, asserting that by unreasonably denying coverage, Defendants were misrepresenting what was covered and failed to disclose this type of injury would not be covered. Pl. Resp. at 51. Since the Court finds Defendants had a reasonable basis on which to dispute or deny coverage there was no misrepresentation or failure to disclose.

Finally, Thompson's claim that Defendants allowed an employer to dictate the handling of the claim in violation of TEX. INS. CODE § 415.022 is denied for the same reason. Defendants had a reasonable basis on which to dispute or deny coverage. There is no evidence Defendants denied

coverage at the urging of the employer or allowed the employer to have any control over the dispute whatsoever.

### 2. DTPA

Thompson also asserts the Insurance Code violations are also violations of the DTPA. Just as with the Insurance Code claims, however, the DTPA claims are premised on the same underlying conduct the Court found reasonable above. Extracontractual tort claims under the DTPA require the same predicate for recovery as bad faith causes of action. *Higginbotham*, 103 F.3d at 460. To establish a statutory violation under the DTPA, the elements necessary to demonstrate an insurer's breach of the common law duty of good faith and fair dealing must be proven. *See id.* As discussed above, such a breach cannot be proven. As such, Thompson's DTPA claims fail.

### Conclusion

Having viewed all the evidence in a light most favorable to Thompson, there is no evidence upon which a rational trier of fact could find for Thompson on any of his claims. Thus, in accordance with the foregoing,

IT IS ORDERED that Defendants' Motion for Summary Judgment [#38] is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Sanctions [#61] is DENIED.

SIGNED this the 21st day of September 2010.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE